ASYLUM OF ST. VINCENT DE PAUL, Plaintiff, *v.* EDWARD J. MCGUIRE and Others, Defendants.

Supreme Court, New York County, May, 1922.

**Brokers — securities held by stockbrokers for safekeeping pledged by them to a bank as collateral for a loan — sale by bank of part of securities to pay loan — bankruptcy of brokers — "larceny creditors" entitled to the return of their unsold securities — an institution whose securities were held by its treasurer, a member of the brokerage firm, and which securities were pledged by said firm with other securities, has no preference over other "larceny creditors" — rights of "larceny creditors" as between themselves and as against creditors whose securities were held by the brokers as margin.**

Independently of any and all others similarly situated one who leaves negotiable securities with his brokers takes the chance of losing them if they are hypothecated with a pledgee who takes them in good faith as collateral for money advanced.

The risk in such case is one which all owners assume who leave their securities thus, and equity will step in and treat them all alike.

A firm of stockbrokers, for a loan obtained from the defendant national bank, pledged certain negotiable securities, some of which were the property of parties who had left them with the firm for safekeeping or for sale. When four years later the firm made a general assignment for the benefit of creditors the bank immediately called in the loan and because of its non-payment sold some of the securities held as collateral. Within three months thereafter the firm was adjudicated an involuntary bankrupt and the assignee for creditors was appointed the trustee in bankruptcy. On the day of the adjudication in bankruptcy the bank to secure the balance due upon the loan sold certain of the pledged securities, realizing a sum that cleared all indebtedness to it under the loan, and there still remained in the hands of the bank some of the securities pledged as collateral, besides a cashier's check representing the sale of a pledged stock. Some of these certificates were handed over to the trustee in bankruptcy and others are now held by the bank, which makes no claim of right or title thereto, and offers to hand them over in accordance with the terms of the judgment to be directed herein. In an action by a creditor of the bankrupt firm to obtain a preference over the other "larceny creditors" it was contended that the securities unsold on the loan should be sold and out of the proceeds plaintiff should receive the value of its securities hypothecated by the firm of stockbrokers. *Held,* that plaintiff had no legal claim against those defendants whose property, also stolen, was jeopardized but not finally lost.

There should not be a sale of the securities that survived the loan, but those defendants who can trace title thereto should have possession of them.

The plaintiff has no right in the securities of another, and if any securities remain they should be liquidated and the proceeds divided *pro rata* in such manner as to pay all or part of the remaining claims of the "larceny creditors," including that of the plaintiff, and judgment is directed accordingly.

ACTION by a creditor of a bankrupt firm to obtain a preference.

*Goldman & Unger (William F. Unger,* of counsel), for plaintiff.

*Edward J. McGuire,* defendant in person.

*James F. McNaboe,* for defendant McGuire, as trustee in bankruptcy.

*Humes, Buck, Smith & Tweed* (*Ben Le Roy Stovell,* of counsel), for defendant Cramer.

*Middlebrook & Borland* (*Percy F. Griffin,* of counsel), for defendant Popp, individually and as trustee.

*Beekman, Menken & Griscom* (*William C. Armstrong,* of counsel), for defendants Monneron & Guye.

*Shearn & Hare* (*Robert O. L. Fay,* of counsel), for defendant Kinney.

*Doyle & McPherson* (*M. McPherson,* of counsel), for the estate of Remigious La Fort.

*Lind & Pfeiffer,* for defendants Fuereste and Loewenwarter.

*Paul G. Gravenhorst,* for defendants Frank et al.

*Peck & Hancock* (*John T. Hancock,* of counsel), for defendant Lummis.

*Charles C. Sanders,* for defendants Salyer et al.

*Franklin Leonard, Jr.,* for defendants Miller et al.

Cohalan, J. Amy & Co. were a partnership engaged in the business of stockbrokers in the city of New York. On March 5, 1919, the members of the firm executed a general assignment to the defendant Edward J. McGuire. In January, 1915, Amy & Co. had obtained from the defendant Chase National Bank a loan of $250,000, and had pledged as collateral therefor, securities, consisting of stocks and bonds of various corporations. The bonds were payable to holder or bearer in the usual form of corporate bonds, and the stocks were represented by the usual certificates, with assignments in blank executed by the party named as owner. Some of the securities thus pledged were those of margin creditors; some were the property of parties who had authorized their pledging; some were the property of parties who had left them with Amy & Co. for safekeeping or for sale. This latter class we might call " larceny creditors," as the firm had no ownership of any kind in these securities.

The plaintiff occupies rather a unique position in this matter. Its securities were left not with Amy & Co., but with a member of that firm who was at the time the plaintiff's treasurer. These securities, in the form of bearer bonds, were delivered by the treasurer to Amy & Co.; were handed over by them as part of the collateral security for the loan; were sold by the bank and the proceeds applied upon payment of the note. On these facts the plaintiff claims a right superior to the other " larceny creditors."

It appears that after the making of the loan by the Chase National Bank, and from time to time, new collateral was substituted in place of some of the original, which was withdrawn.

On March 5, 1919, the date of the assignment, the Chase National Bank demanded payment of the loan, and the same not being paid, it sold some of the securities on March thirteenth, realizing in round figures the sum of $255,000. After this sale, but within a day or so, the bank received from the attorneys for defendant Cramer a letter advising it that certain securities held as collateral to the loan were the property of Cramer and not of Amy & Co. The securities mentioned in this letter were 100 shares of Western Union, 133 shares of Pittsburgh Coal preferred and 62 shares of Pacific Coast preferred. The Western Union shares had been sold, but on receipt of the letter the defendant bank retained in its possession and still has a cashier's check for the proceeds of the sale in the sum of $8,833.50. On March nineteenth the bank, to secure the balance due, sold six bonds of the Hocking Valley and 28 shares of the New York Dock Company preferred, realizing on such sales $5,852.64, and thus clearing Amy & Co. of all indebtedness to it under the loan. There then remained in its hands some of the securities pledged as collateral, and the cashier's check representing the sale of the Western Union stock. Of these certificates some were handed over to the trustee in bankruptcy, and others at this time are held by the bank, which, however, claims no right or title to them and offers to hand them over in accordance with the terms of the judgment herein.

On March nineteenth of the same year a petition in involuntary bankruptcy was filed against Amy & Co. in the District Court of the United States for the Southern District of New York. An adjudication was entered thereon on June ninth, and defendant McGuire was appointed trustee in bankruptcy.

The plaintiff contends that the securities unsold on the loan should be sold, and out of the proceeds it should receive the value of its securities hypothecated by Amy & Co. I cannot agree with this contention. That its property was stolen from it by its treasurer and turned over by him to the firm of which he was a member is further evidence of the frailty of human nature, but the fact gives the plaintiff no legal claim against those defendants whose property, also stolen, was jeopardized but not finally lost.

At the time of the assignment Amy & Co. held certain securities of Monneron & Guye, and prior to the assignment they had pledged all of these except a $1,000 bond of the Southern Railway Development and General Mortgage 4s with the Chase National Bank as part of the collateral to the loan. These securities had

been deposited with Amy & Co. for safekeeping only. Of the other securities deposited on the loan Monneron & Guye contend that the $500 Norfolk and Western bond and the ten shares of Norfolk and Western preferred, not sold by the bank, should be returned to them, with all accrued interest and dividends, and further, that they are entitled to the sum of $3,611.65, with interest, representing the proceeds of their securities that were sold by the bank.

The defendant Cramer contends that the 100 shares of Western Union, 62 of Pacific Coast Company and 133 of Pittsburgh Coal preferred were the property of Cramer's predecessor in title; were left in the hands of Amy & Co. for safekeeping; were delivered by that company to the bank as part of the collateral security to the loan, and were pledged subsequent to the date of the original loan. The Pacific Coast and Pittsburgh Coal shares were not sold by the bank; the Western Union were, and the result of this sale is the cashier's check for $8,833.50. It was the attorneys for this defendant who wrote the letter to the bank which caused it to hold the check for the proceeds. An action in replevin was commenced by Cramer, but was stayed by an order entered in this action. This defendant contends that he is entitled to the immediate possession of the Pacific Coast and Pittsburgh Coal shares and to the check representing the proceeds of the sale of the Western Union shares.

The defendants Cramer, Monneron & Guye, Popp, La Fort, Frank, Salyer, Walsh, Connolly, Charles C. Miller, Clare J. Miller, all left their securities with Amy & Co. for safekeeping or for sale. They were not margin creditors. They were not indebted to Amy & Co., and their securities were part of the collateral to the loan. The International Catholic Truth Society was in this same class. Some question arose at the trial as to whether or not by reason of its default herein proof should be taken and rights adjudicated on its behalf in this action. The remaining defendants were either margin creditors or what may be called "family creditors."

Amy & Co. under the law had the right to pledge the securities of the margin creditors, and the testimony shows that the "family creditors" all consented that their securities might be pledged.

Two questions press for solution in the present action: *First*, whether or not the plaintiff has a right superior to that of the other "larceny creditors," and may call for the sale of the securities unsold by the bank, and may be reimbursed in full from the proceeds of such a sale before any of such proceeds be distributed to the other "larceny creditors." *Second*, whether or not the

Supreme Court, May, 1922.                    [Vol. 118

unsold securities pledged to the bank on the loan should be sold and the proceeds, together with the $8,833.50 cashier's check, distributed *pro rata* among the " larceny creditors " as is urged on the theory of cosuretyship. Some of the defendant " larceny creditors " believe this should be done. Cramer and Monneron & Guye claim they are entitled to their specific securities and the $8,833.50 cashier's check, and that there should not be a sale and distribution.

Prior to *Matter of Wilson & Co.,* 252 Fed. Rep. 631, the decisions, outside of the Special Term decision of *Whitlock* v. *Seaboard National Bank,* 29 Misc. Rep. 84, held that the title to securities stolen and pledged for a loan survived the sale; that they are the property of their owner, and are not subject to a sale and division of the proceeds *pro rata* among the other " larceny creditors " whose securities had been sold under the loan. The general principle seems to be that a stolen security cannot be held against the true owner by any one — not even a purchaser in good faith for value. *Newton* v. *Porter,* 69 N. Y. 133, 136. To that general principle, however, there is an exception tending to the protection of purchasers of pledges in good faith and for value of negotiable instruments and corporate stock certificates — when they are accompanied by absolute written transfers of title. This exception extends only to the protection of one who has parted with value on the faith of the apparent title of the seller or pledgor. One who has not parted with value under such circumstances comes under the general rule, and the true owner is entitled to his property against such a party. *Tompkins* v. *Morton Trust Co.,* 91 App. Div. 274, 279; affd., on opinion below, 181 N. Y. 578. In this case there was but one claimant, but the decision seems to indicate that as against the owners of the securities that had been sold Hastings would have been entitled to his securities which had survived the sale.

*Matter of McIntyre & Co.,* 181 Fed. Rep. 955, is a case somewhat in point with the present one. The securities were wrongfully pledged. Pippey identified a certain certificate which had survived the sale by the pledgee. The lower court directed a sale and distribution of the proceeds among the " larceny creditors." The appellate court, however, set aside this judgment, citing *Tompkins* v. *Morton Trust Co., supra,* in support of its decision. It held that the pledgee had reimbursed itself from the sale of the other items of the pledged property and no longer had a lien on Pippey's stock, and so the latter was entitled to that stock and to the certificate which represented that title. The court said the lower court, by directing a sale of the stock and distribution of the

proceeds, was applying the principle of general average to the situation, whereby the pledge is treated as a common adventure and the securities sold as a sacrifice for the common benefit, to which all interested are required to contribute, and that in so holding the lower court was in error.

This decision seems not to have been disputed until *Matter of Wilson & Co., supra.* The court in the latter case attempts to distinguish its decision from the *Pippey* case, and in doing so apparently takes the position that had there been others in a class with Pippey the court would have disallowed his claim and directed a sale of the securities and a distribution of the proceeds *pro rata* among that class.

I am free to confess that I do not agree with the learned court in either the result or the reasoning. The court says that " equity will treat alike those similarly situated." This is when properly applied. It would be so here were the owner of any of the unlawfully pledged securities attempting to recover them from the bank while its loan was still in existence. It is a feature common to all similarly situated that, independently of every other security owner, one who leaves his securities in a negotiable form with his brokers takes the chance of losing them if they are hypothecated with a pledgee who takes them in good faith as security for money advanced. It is in this respect that the rule of equity referred to applies. It is a risk which all security owners assume who leave their securities thus, and equity will step in and treat all alike that assume this risk. In the *Wilson* case the court distinguished between a sale of the securities before and after bankruptcy, as it says that " the case is very different from one where a pledgee rightfully holds collateral prior to the bankruptcy." I can see no difference in the right, whether before or after bankruptcy, unless we are to assume the condition as assumed in the *Wilson* case. I do not think such an assumption should be the basis of a distinction. The present case, as well as the *Wilson* case, is distinguishable from *Matter of Toole,* 274 Fed. Rep. 337. The relationship existing between persons claiming securities unlawfully pledged, as well as the right to a sale and contribution, was discussed by the court in the *Toole* case. The securities were lawfully pledged by the bankrupt, and the question of unlawfully pledged securities was not before the court, and the comment on the decision in the *Wilson* case was merely *dictum.* There was nothing before the court to show under what circumstances the securities of the various creditors were pledged.

It is conceded here that this property was not owned by the bankrupt. The bankruptcy of the brokers could have no effect

whatsoever upon securities wrongfully pledged, nor upon any claim connected therewith, because such securities were not the property of the broker, but of others from whom the brokers had stolen them. *Matter of Amy*, 263 Fed. Rep. 8. Apparently the court in the *Wilson* and *Toole* cases did not consider this phase of the matter.

Here there is no privity of contract between those who found themselves, through the acts of Amy & Co., in a common predicament. They were not joint venturers. They had not together sought out the firm as a depositary or a broker. They were to all intents and purposes entire strangers to one another. Their securities were in the main different in origin and in some cases even in character. They had nothing in common except that their property was stolen from them by a firm in which they had placed confidence. The measure of confidence in the firm or a member thereof which had brought about a deposit of the securities may determine the relative moral debt owed by the firm to them or fix its degree of guilt in each case, but it does not change the legal rights or give to one who was unfortunate enough not to have had his property recovered from the thief the right to share in the good fortune of those whose specific property was recovered. There was a community of jeopardy, but a particularity of safety.

I have made a careful review of the various cases cited in the briefs by learned counsel, and am convinced that there should not be a sale of the securities that survived the loan. Instead, those defendants who can trace title to the unsold securities should have possession of them. I do not see that the plaintiff has any right in the securities of another. If any securities remain they should be liquidated and the proceeds divided *pro rata* in such manner as to pay all or part of the remaining claims of the " larceny creditors," including the plaintiff. As indicated, judgment should be entered, without costs to any party as against the other. Submit findings.

Judgment accordingly.